# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**RHONDA MICHELLE BRITTON,**
**GLENN BRITTON,**
**CHRISTOPHER BRITTON, and**
**DAMIAN BRITTON,**

      **Plaintiff,**

**vs.**                                                    **Case No. 4:11cv32-RH/WCS**

**WAL-MART STORES EAST, L.P.,**

      **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Pending in this case is Plaintiffs' motion for sanctions for spoliation of evidence. Doc. 33.  The motion has been supplemented several times.  Docs. 34, 35, 36, 37, 41, 42, 49, 54, 55, and 68.  Defendant filed a response, doc. 56, and a supplement.  Doc. 71.

An evidentiary hearing was held on May 31, 2011.  The parties have agreed that in addition to evidence presented at that hearing, the court shall consider as evidence all documents filed to date (with the exception of the objections noted in the motion to strike).  The case has recently been reassigned to District Judge Hinkle.

**Procedural context of this spoliation motion**

This is a diversity suit.  Doc. 1, p. 1.  Plaintiff Rhonda Britton is the mother of Plaintiff's Christopher and Damian Britton, two teenage children.  *Id.*, p. 2.  Glenn Britton is her husband.  *Id.*  It is alleged that on October 29, 2009, Rhonda Britton and her children shopped at the Walmart store (number 1408) on West Tennessee Street, Tallahassee, Florida.  *Id.*, p. 3.  Damian Britton, then fourteen years old, has juvenile spondyloarthropathy, a rare form of arthritis.  *Id.*  Christopher Britton was fifteen years old.  *Id.*, p. 4.  While Ms. Britton shopped for groceries, her two sons walked throughout the store.  *Id.*, p. 5.  It is alleged that at no point did the children touch any digital cameras.  *Id.*, p. 6.   As the Brittons left the store, it is alleged that a Wal-Mart security officer stopped them and profanely accused the children of stealing a digital camera, displaying to them an empty cardboard box as evidence of the theft.  *Id.*, p. 7.  It is alleged that he then committed child abuse, assault, battery and falsely imprisoned Damian Britton, and then falsely imprisoned Ms. Britton and Christopher Britton.  *Id.*, pp. 8-9.  Ms. Britton suffered a heart attack caused by the actions of Walmart employees.  *Id.*, pp. 13, 17.  It is alleged that the store manager admitted to a Florida Highway Patrol trooper that the surveillance videos did not show Christopher Britton taking any merchandise from the shelves or taking any items into the bathroom.  *Id.*, p. 5.  It is alleged that the two Britton children were under video surveillance "the entire time they were inside the store, up to and including the time they entered the restroom.  The store manager was aware of this fact."  *Id.*, p. 6.

Florida Statute § 812.015(3)(a) provides that a merchant who has probable cause to believe that a retail theft has been committed by a person has authority to take the offender into custody and detain the offender for a reasonable period of time. Subsection (5)(a) of that statute provides a defense from civil liability for false imprisonment or false arrest if there was probable cause.

Defendant has not yet filed an answer.  In the joint report filed on March 23, 2011, Defendant asserted in part that "the alleged actions taken by Defendant's employees were in defense of Defendant's property based on suspicion of retail theft" and "to the extent any restraint or detention occurred, it was based on a suspicion of retail theft and Plaintiffs['] claims are barred pursuant to §812.015, Florida Statutes." Doc. 15, p. 4.

On April 5, 2011, Plaintiffs filed a motion seeking expedited production of the surveillance videos in the possession of Defendant prior to their depositions, scheduled for April 18 and 19, 2011.  Doc. 17.  Defendant opposed expedited production, arguing that production of the videos prior to the depositions would "eliminate impeachment value the video may have to Defendant in defense of the allegations made by Plaintiffs as to what occurred during their encounter with Defendant's employees."  Doc. 22, p. 3. I carefully read the complaint before ruling on this motion, and the "allegations made by Plaintiffs as to what occurred during their encounter with Defendant's employees," as used by Defendant in response to the motion, was plain to me from the complaint. Indeed, the videos of the two children inside the store seemed to me to be the primary evidence in this case.  I read Defendant's objection to expedited production as founded upon the reasonable notion that Defendant did not want the children to see the videos

of themselves walking through the store before they were deposed.  While the issue was reasonably debatable, I granted Plaintiffs' motion.  The next day the video recordings were made available to Plaintiffs.

As it is turns out, Defendant's objection to expedited production of the videos was obfuscation of the first order.  A video record of surveillance of the children inside the store did not even exist at that time that Defendant argued that it would be unfair to produce it.  The record had been written over by subsequent surveillance.  This motion for spoliation of evidence followed.  Doc. 33.

**Findings of fact**

Interrogatory 4 of Plaintiffs' first interrogatories asked Defendant to set forth all facts providing probable cause to detain Plaintiff "if you assert that the Defendant . . . had probable cause to detain any Plaintiff in this matter . . . ."  P. Ex. 3, interrogatory 4. On May 11, 2011, Defendant responded in part:

> Defendant denies any Plaintiff was ever detained during the incident complained of.  Nonetheless, to the best of Defendant's knowledge and belief, probable cause to detain the Plaintiffs existed based on the following: Former Maintenance Associate Steven Steele observed Plaintiffs Christopher and Damian Britton in the restroom at the back of the subject store.  He heard a ruffling of merchandise packaging in a toilet stall within the restroom while Plaintiff Christopher Britton was in the stall for a lengthy period of time and Plaintiff Damian Britton was walking around the restroom outside the stall.  When Plaintiff Christopher Britton exited the stall, Mr. Steele found and retrieved an empty package for a digital camera in the trash can within the stall that was not present in the trash can an hour earlier.  Mr. Steele exited the restroom, gave the packaging to former Asset Protection Associate Derrick Lott, notified Mr. Lott of his observations, and identified Plaintiffs Christopher and Damian Britton to Mr. Lott.  Mr. Lott watched Plaintiffs Christopher and Damian Britton as they walked from the men's restroom in the back of the store to the store's exit at the front of the store.  When Mr. Lott saw Plaintiffs Christopher and Damian Britton exit the building without making any purchase, he asked them if they had dropped something in the store and

> Mr. Lott showed them the digital camera's empty packaging.  Plaintiffs
> Christopher and Damian Britton began cursing at Mr. Lott and continued
> walking toward their car.  When Plaintiffs Christopher and Damian Britton
> met up with their mother, Plaintiff Rhonda Britton, near Plaintiffs' car,
> Plaintiff Rhonda Britton began cursing at Mr. Lott and other Wal-Mart
> employees.  Investigation, discovery and trial preparation are ongoing and
> may reveal additional information responsive to this interrogatory.

P. Ex. 27, doc. 68, amended answer to interrogatory 4.  Defendant is actively

interposing the theory that its employees acted reasonably based upon the actions of

Mr. Steele, the maintenance man, and Mr. Lott, the asset protection associate.

Plaintiffs' Exhibit 5 is a letter dated November 2, 2009, from Steven Andrews to

Michael Taylor, the general manager at the Walmart store in question.  The letter states

that the subject is "**Legal Representation and PRESERVATION OF EVIDENCE**,

Regarding Incident at Walmart Regarding Britton Family."  P. Ex. 5 (emphasis in the

original).  It reads in part:

> This firm represents the Britton family regarding an incident which
> occurred at Walmart located at 4400 W. Tennessee Street, in
> Tallahassee, Florida, On October 26, 2009.  As the Britton Family's legal
> representative, I respectfully request that you maintain all surveillance
> video and/or audio tapes recorded during this time period, both indoors
> and outdoors, as well as any records or notes that are or may be related
> to the incident.

P. Ex. 5.

On November 3, 2009, Danielle Snyder, a college student who was working as a

runner for Steven Andrews, delivered the original of the letter at the Walmart store in

question to a Caucasian male employee who identified himself as a manager.  Ms.

Snyder credibly testified that she had been instructed to hand the letter to Mr. Taylor,

but when she reached the store, she was told that Mr. Taylor was on break or at lunch.

Ms. Snyder called back to the Andrews firm to ask what to do and was told that it would

be acceptable to deliver the letter to another manager.  She asked for a manager and she delivered the letter to the manager who was made available to her, whom she was told was the manager below Mr. Taylor.[1]  She told this manager that the letter was from a law firm, that it was an important document, and that he must deliver the letter to the addressee, Michael Taylor.  She said that this manager in charge said he would give it to Mr. Taylor.

On November 11, 2009, Steven Andrews sent a letter by facsimile to Mr. Taylor identifying Rhonda Britton as his client regarding her application for a leave of absence under the Family Medical Leave Act.  P. Ex. 11.  Andrews told Mr. Taylor that he was checking to be sure he had been contacted "regarding the same."  *Id.*

On November 17, 2009, Steven Andrews sent a letter to Mr. Taylor by certified mail, return receipt requested, identifying Rhonda Britton as his client.  P. Ex. 12. Andrews stated in the letter that he had been retained by Ms. Britton "for injuries she sustained as a result of an accident/incident which occurred on October 26, 2009."  *Id.* The letter sought information about Walmart's insurance coverage.  *Id.*

Marlene Tyre, secretary and paralegal for Steven Andrews, credibly testified that she called Walmart to follow up on the requests for evidence preservation in the November 3, 2009, letter.  While I did not note the date of her call, it must have been around November 30, 2009, because on that date, Latrece Gautier, the supervisor of the asset protection office for this Walmart store, called Ms. Tyre in response to her telephone inquiry about preservation of the video evidence.  Ms. Tyre asked Ms. Gautier about the surveillance videos, and Ms. Gautier told her that there was no

---

[1] Michael Taylor testified that in his absence, assistant managers were in charge.

incident report and there were no videos of "the incident."  Ms. Tyre said that she then

connected Ms. Gautier's telephone call to Mr. Andrews.  Ms. Gautier testified that she

did not remember the telephone call to the Andrews law office, but her lack of memory

about a matter of this importance detracts from her credibility.  I conclude that Ms.

Tyre's testimony is considerably more credible because Andrews wrote a letter to Mr.

Taylor dated November 30, 2009, in which he stated:

> This will confirm that Latrece Gautier, identifying herself as a Walmart
> Manager at store 1408, called my office and informed my office that
> Walmart did not have any knowledge or documentation regarding the
> accident of the above individual [the letter identified Rhonda Britton as the
> client] at your store on October 26, 2009.  She also stated that there were
> no statements made or videos of the incident.

P. Ex. 8.  It is highly unlikely that Andrews would have written this letter if Ms. Gautier

had not made the statements heard by Ms. Tyre.

Brian Timmons, a Florida highway patrol trooper, testified that on October 26,

2009, he was in Tallahassee for mandatory recertification and for an awards ceremony.

He said that technically speaking, he is always on duty.  He and another trooper went to

the Walmart store that day.  Officer Timmons saw the altercation outside the store, and

was waived down by Ms. Britton.  He said he then spoke with the Britton family and

Walmart employees.  Officer Timmons said that a Walmart asset protection employee

had an empty digital camera box and told him that one of the Britton teens had stolen

the digital camera that had been in the box.  The children gave consent to search and

emptied their pockets.  The asset protection association told Timmons that he observed

the children walk into the bathroom, and he had followed them.  He said that he had not

seen the children in possession of a camera.  The asset protection employee did not

mention the existence or relevance of a maintenance man to Officer Timmons.  Officer

Timmons said that had a maintenance man been mentioned, he would have interviewed

the maintenance man.  Officer Timmons said that he told the asset protection associate

that the associate had not had probable cause based upon what Timmons had been

told.  The asset protection associate reluctantly told Officer Timmons that he had

touched the children, and Officer Timmons told him that the touching could be a battery

on his part.  Officer Timmons said he was not prepared for a full scale investigation, and

he said that if he had determined that there was probable cause that a crime had been

committed, he would have called in local law enforcement to impound evidence.

Officer Timmons then went to the asset protection room and stood at the door,

watching reruns of the indoor surveillance video showing the Britton children walking

into the bathroom area.  He said he saw nothing suspicious on this video in the behavior

of the children entering the restroom.  The children were not looking around to see if

they were being watched, and there were no bulges in their clothing.  The area that was

shown on the video is a pathway bounded by a wall on one side and perpendicular

aisles on the other as depicted in yellow highlighting on P. Ex. 25 (a detailed map of the

store) marked "CCTV Camera Covering Restroom Foyer."  The camera could only

record movement in that pathway.  A person walking on the pathway away from the

camera would enter the area just outside the restroom doors by turning right and, after

turning right, would no longer be visible to the camera.

Officer Timmons said he then asked the white female "manager" whether she

had reviewed the surveillance videos.  She told Officer Timmons that she saw nothing

on the tapes of the kids, and she said that the inside surveillance videos had not shown

the children stealing anything.  She told Officer Timmons that she thought it was more likely that this was a theft by an employee.

On the day of the evidentiary hearing, Officer Timmons saw Hillary Aultman outside the witness room and identified her as the white female manager he spoke with that day.  Officer Timmons testified that he told Ms. Aultman to be sure to save the video.  He said that she claimed that there were problems downloading the tapes. Officer Timmons said that he specifically told Ms. Aultman that this incident could result in criminal or civil litigation, and he specifically instructed her to save the surveillance videos showing what the Britton children did inside the store.  He said he told Ms. Aultman twice that she must preserve the videos.  He said that the inside videos were critical, in his opinion.  On cross examination, Officer Timmons said that he asked Ms. Aultman to preserve the video evidence of the "incident," and did not specifically mention the inside videos, but, in his opinion, the "incident" included a possible battery upon one of the Britton children.

Officer Timmons said he was told on the scene that the Britton family did not want to press charges, and that had they expressed that desire, he would have written up a report.  He said Ms. Britton said she did not wish to press charges because she then had begun to exhibit signs of having a heart attack.  He recognized the signs of a heart attack from his law enforcement training.

Officer Timmons was a very impressive young officer.  He had no motive to bend the truth.  His memory was clear, and he approached the altercation in an organized way.  His testimony was very credible.

James Sims worked at Walmart as an asset protection associate.  His supervisor

was Latrece Gautier.  Sims was in charge of the video surveillance system.  The store

had a number of cameras around the store, and 15 to 16 monitors in the surveillance

office.  The video cameras were continuously on and recorded to a DVR (digital video

recorder).  As time elapses, the oldest videos on a particular DVR are overwritten by

new videos and thus are lost.  The videos could be played back from the DVR, and a

copy could be preserved by downloading to a computer and "burned" to a DVD (digital

versatile disc).

Sims said that he routinely can "pull" a video from a DVR that is 45 days old

since the DVRs often hold videos for longer than 30 days.  He said that as late as

December 15, 2009, he might have been able to save and preserve some of the inside

videos of the Britton children moving through the store on October 26, 2009.  Sims said

that every DVR is different, and some preserve videos longer than others.

During examination, Sims was shown the November 2, 2009, letter from

Andrews to Taylor notifying Taylor that he represented the "Britton family" regarding the

October 26, 2009, "incident," and requesting that Taylor preserve "all surveillance video

and/or audio tapes recording during this time period, both indoors and outdoors . . . ."

P. Ex. 5.  Sims had not seen the letter, but he said that had he seen this letter, he would

have preserved all of the surveillance videos of the Britton children inside the store, as

well as the outside videos.  By this testimony Sims obviously considered the word

"incident" as used in this letter to mean everything that happened on October 26, 2009,

inside the store and out, that resulted in the accusations made against the Britton

children.  Sims said that he knew that the videos of the Britton children inside the store

were critical to their veracity and important to the evaluation of the actions of Derrick

Lott.  Sims said: "It changes everything if they stole something."

Sims said he did not think that Michael Taylor, the manager, had asked him to

look at the videos of the Britton children inside the store, but he did that on his own.

Sims said that the surveillance videos of the Britton children inside the store revealed

them walking through the store not doing anything that raised suspicions.  Sims said

that he did not see a maintenance man following the Britton teens out of the restroom

on the surveillance videos.  He said that no one asked him to save those videos, and

had he been asked, he would have saved them.  He did not remember talking to Taylor

about the incident.  Sims said that he might have saved to DVD the first surveillance

videos of the activity outside the store (which were given to Plaintiffs in discovery) as

early as November 4, 2009.

Sims said that he had no knowledge that anyone suspected that an employee

had stolen a camera.  Had he been told of this, he would have reviewed the video

surveillance evidence of the camera store room to see if it revealed evidence of theft by

an employee.

Sims said that there was a Walmart policy that empty merchandise boxes found

in the store are scanned into a computer for inventory control.  He said that no one told

him that Derrick Lott had a box claiming that it was the box from which a camera had

been stolen, and no one told him to scan such a box.  He also said that no one asked

him to find the maintenance man, and it did not occur to him to do so on his own.  Sims

said that no asset investigation system report was made.

Sims was a straight-forward witness.  He answered directly, without hesitation. He did not contort the meaning of ordinary English in his understanding of the questions, and he was not grudging with his answers, unlike Walmart witnesses Gautier, Aultman, and Taylor.  He was completely credible.

Latrece Gautier was the supervisor of the asset protection office.  She reports directly to Michael Taylor when he is in the store, and she reports directly to Hillary Aultman, the co-manager, when Taylor is not in the store.

Ms. Gautier said that an empty merchandise box should be scanned into the computer as "stolen" when an empty box is found.  The empty box should be taken to claims.  Gautier said she never saw an empty digital camera box in Derrick Lott's possession.  Gautier was aware that Lott had said that a maintenance associate had given him an empty camera box, but Mr. Taylor never asked her for the name of the maintenance man.  She said that had there been a description of the maintenance man, it would have been very important to find him and "get an affidavit."  This explanation was not reasonable, and detracted from the credibility of Ms. Gautier.  She was the head of the asset protection office.  It seems incredible to me that she did not hunt down the maintenance man and "get an affidavit" from him, and that she did not preserve the alleged empty camera box.

Gautier said that video on the DVRs is saved by date.  She said that sometimes she can locate video as long as 60 days after the date of the event recorded, and that it depended upon the DVR.  She said that after 60 days at least 80% of the time the video is still there and has not been overwritten.  Gautier could not recall looking at surveillance videos of the Britton children, and she could not recall that Sims looked at

these videos.  She said she instructed Sims to download the video of the "incident."

This seems incredible to me as well.  Evidence that the Britton teens actually stole a

video camera is at the heart of this case.  It was at the heart of her asset protection

duties as well.  Looking at the indoor video surveillance of the Britton teens and the

preservation of that evidence, regardless of what it showed, should have been the first

order of business for Ms. Gautier.  She probably still could have done this as late as

November 30, 2009, as it was entirely likely that the video evidence still existed on the

DVRs then.

Hillary Aultman was one of three co-managers directly under Michael Taylor.

According to her supervisor, Michael Taylor, she was the manager in charge when

Taylor was not at the store.  Michael Taylor testified that the co-managers are

responsible, among their other duties, to preserve merchandise from theft.  Ms.

Aultman, however, testified that asset preservation was not her job.

Ms. Aultman testified that she was outside the Walmart store smoking a cigarette

when the altercation with the Britton family began on October 26, 2009.  She said she

spoke to a highway patrolman who was there, but she could not recall what she said.

She did not recall telling the highway patrolman that she had observed the videos of the

Britton children inside the store or that she told the officer that she saw no evidence of

theft.  Ms. Aultman testified that she did *not* watch any of the video surveillance

evidence that day or on any other day.  She said she had *not* been asked by anyone,

including Officer Timmons, to preserve videos from that day, and she did not talk with

James Sims, who is responsible for the video surveillance system.

Ms. Aultman said that after the "ruckus" had calmed down, she was told "of the maintenance man," the one who was said to have given an empty digital camera box to asset protection associate Derrick Lott and told Lott that the Britton children had stolen the camera that had been inside the box.  She said that pursuant to Walmart protocol, the asset protection associate has to see someone take the merchandise.  She said that she determined that Derrick Lott did not see anyone take the digital camera, and decided that no one had been detained, so there was no reason to find the maintenance man and interview him.

She said that she "vaguely" recalled that Mr. Lott was waiving an empty box around.  Ms. Aultman did nothing to find this maintenance man and interview him or cause him to be interviewed.  She said an interview with the maintenance man was not relevant.  Ms. Aultman said that Walmart has a policy that empty merchandise boxes are scanned into the computer as an inventory adjustment.  She did nothing to see that the box that Mr. Lott was waiving around was scanned into the computer.  She said that an incident report *was* prepared for the October 26th incident.

Ms. Aultman's testimony was not credible at all.  As noted earlier, Officer Timmons was a thoroughly credible witness.  He in fact told Ms. Aultman to preserve the videos, and Ms. Aultman's testimony to the contrary is not credited.  Even if Ms. Aultman's only focus that day was to decide whether to fire Derrick Lott, viewing the inside surveillance videos of the Britton teens to make and support that employment decision, and preserving them, was the first order of business to implement that managerial goal.  I find that Ms. Aultman fully understood the importance of the indoor surveillance videos of the Britton children, looked at them, knew that the videos would

disappear over time if not preserved by downloading them to the computer, and consciously chose to let that happen since the videos were damaging to Walmart's defense against claims that might be brought by the Britton family.

Michael Taylor testified that he has been the general manager of West Tennessee Street Walmart store number 1408 for the last four years.  He had been a co-manager (also known as a shift manager) for about six years in other stores, the same job as held by Ms. Aultman.

Mr. Taylor said that on October 26, 2009, he was notified of the altercation with the Britton family by cellphone.  He said that on the next day, he looked at the videos that were available.  He said that he did not know that Officer Timmons had asked Walmart to preserve surveillance evidence.  Mr. Taylor acknowledged that Walmart has a policy that surveillance video recordings "must be retained for a minimum of 30 days." That policy is in Plaintiffs' Exhibit 15.

Mr. Taylor, like Ms. Aultman, said that he was investigating the conduct of his associates.  He said that it was Walmart policy that before an asset protection associate may confront a customer about shoplifting, four elements must exist: the associate must see the customer taking the merchandise, must see the customer with the item concealed, must maintain constant visual contact, and the customer must pass the last marker exiting the store.  Mr. Taylor said his focus was to determine whether all four elements were in place to justify the actions of Derrick Lott.

Mr. Taylor said that he reviewed surveillance videos of the Britton children.  He did not see anything on the video of the children touching merchandise in the camera section, did not see them with merchandise in their hands at any time, and he did not

see them take merchandise into the restroom.  He knew that the children had entered the restroom and that his employees had lost visual contact.  He explained that when visual contact is lost, that is the "end of the game," and an employee cannot pursue.

Mr. Taylor said that he thought that what happened to Ms. Britton outside the store was a separate incident.  He said that Ms. Britton's husband made known to him what his wife suffered outside the store.  Mr. Taylor said: "I felt like we had the video to support the incident."

Mr. Taylor said that the maintenance man was not relevant to his investigation. He admitted, however, that had the indoor surveillance video shown the maintenance man picking up a digital camera and going into the bathroom, the maintenance man would have been fired.

Mr. Taylor said that he did not find Plaintiff's Exhibit 5, the November 2, 2009, preservation of video surveillance evidence letter, until November 30, 2009.  He said he found it on his desk among other "legal papers."  He said that he immediately sent a copy of this letter by facsimile to the home office.  The FAX was sent at 3:53 p.m. on November 30, 2009.  Mr. Taylor said that he did not question why the November 2nd letter did not come to his attention until November 30, 2009.  He said it was not out of the ordinary to discover 28 day old letters on his desk.

On December 14, 2009, Jeff Southerland sent an email from the "home office" which Mr. Taylor testified that he received.  The email in a redacted form is attached to document 71.  The email states that it relates to the alleged claim by Rhonda Britton of "alleged heart attack due to altercation."  Doc. 71-1, p. 3 on ECF.  Southerland said to the recipient of this email (whose name has been redacted): "Also, I need all video of

the person from the moment they enter Wal-Mart property until they leave Wal-Mart property.  If there is no video available I need an explanation why."  *Id.*, (apparent quotation marks omitted).

Mr. Taylor did not take any steps to preserve the video evidence of the activity of the Britton children inside Walmart immediately after the altercation on October 26, 2009, on November 30, 2009, when he says he first noticed the November 2nd evidence preservation letter, or on December 14, 2009, when he received the email from Mr. Southerland.  He testified that he considered the "incident" in question to only involve the altercation outside of Walmart, which resulted in the claim that Ms. Britton suffered a heart attack.  The outside videos had already been preserved, so he reasoned that he did not have to do anything further to preserve video evidence.  He thought that the only potential claim against Walmart would relate to the heart attack suffered by Ms. Britton outside the store.

I find that Mr. Taylor's testimony was self-serving and not credible as to the most important points.  Even if Mr. Taylor thought that the only claim was one for an alleged heart attack suffered by Ms. Britton, the alleged cause of that injury was the way in which Walmart employees accused the Britton children of shoplifting and allegedly detained them with force.  Mr. Taylor looked at the video surveillance of the Britton teens and he knew that the evidence would be highly relevant to show that Walmart employee Derrick Lott did not have just cause to confront and detain them.  The indoor video evidence was damaging to Walmart's defense of whatever claims might be brought by the Britton family.  Mr. Taylor's insistence that the only relevant surveillance evidence was that showing the altercation outside the store is nonsense, and I do not

believe that he actually believed that at any point.[2]  Walmart does its business because of what it has inside its store, not what happens outside.  The altercation outside the store would never have happened had Derrick Lott not thought that the Britton teens had left the store with a stolen digital camera.  The measure of the reasonableness of Walmart's treatment of the Britton family and of Derrick Lot depends *almost entirely* upon what the Britton children did inside the store.  The video surveillance of those events was of far greater importance to discern the truth and justice of the "incident" in its entirety than were the outside videos.

I further find that Mr. Taylor had the November 2, 2009, letter on or about November 3rd or shortly thereafter, and he intentionally sat on it, hoping that in time the inside video evidence would be overwritten and disappear because it was damaging to Walmart's defense of potential claims.  It is telling that he said at one point:  "I felt like we had the video *to support* the incident."  He acted to preserve only defensive evidence.  He found himself in the uncomfortable position of being unable to continue to sit on it on November 30, 2009, when Andrews's office reached Latrece Gautier, and Gautier became aware that there was a demand for preservation of video evidence.  At that point, he "noticed" the November 2nd letter, which he had already known about for weeks, and sent it to his home office because he had no other choice.  He could not

---

        [2] He certainly could not have continued to believe that after November 30, 2009, when, according to him, he first saw the November 2, 2009, preservation letter.  And even if one were to believe he had not seen the November 2d letter until November 30th, which I do not, that he did not immediately ask Gautier and Sims to look for the inside surveillance videos and preserve them is but further evidence that Taylor intended that the inside video evidence become lost by inaction to preserve it and the passage of time.

longer pretend that he had not received it because Ms. Gautier was aware that the letter existed.

In short, the spoliation of the evidence in this case was an intentional act by Defendant, through actions of its managers.

**Legal analysis**

"[S]poliation is defined as the destruction of evidence or the significant and meaningful alteration of a document or instrument." Green Leaf Nursery v. E.I. DuPont De Nemours and Co., 341 F.3d 1292, 1308 (11th Cir. 2003), *cert. denied*, 541 U.S. 1037 (2004) (quotations marks omitted), *quoting* Aldrich v. Roche Biomedical Labs., Inc., 737 So. 2d 1124, 1125 (5th DCA 1999) (quoting BLACK'S LAW DICTIONARY 1401 (6th ed.1990). "[A] party moving for sanctions must establish, among other things, that the destroyed evidence was relevant to a claim or defense such that the destruction of that evidence resulted in prejudice." Eli Lilly and Co. v. Air Exp. Intern. USA, Inc., 615 F.3d 1305, 1318 (11th Cir. 2010), citing Flury v. Daimler Chrysler Corp., 427 F.3d 939, 943 (11th Cir. 2005).

While Flury held that sanctions for spoliation is a matter of federal evidentiary law in a diversity case such as the case at bar, the court also consulted to Georgia law. *Id.*, at 944. The court noted that under Georgia law, the remedies for spoliation included exclusion of certain evidence or "outright dismissal of the case." 427 F.3d at 945. Then citing Chapman v. Auto Owners Ins. Co., 220 Ga.App. 539, 469 S.E.2d 783 (Ga. App. 1996), the Flury court said:

> In determining whether dismissal is warranted, the court must consider:
> (1) whether the defendant was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical

importance of the evidence; (4) whether the plaintiff acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence was not excluded.  As sanctions for spoliation, courts may impose the following: (1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliation.

*Id.*  It is noteworthy here that the Georgia case set forth these standards for both dismissal and the lesser sanction of exclusion of evidence.  469 S.E.2d at 785.  These factors have become the federal standard in this circuit for spoliation claims.  "To determine whether spoliation sanctions are warranted, a court must consider the factors identified in" Flury.  Graff v. Baja Marine Corp., 310 Fed.Appx. 298, *301 (11th Cir. 2009) (not selected for publication in the Federal Reporter, No. 08-10413).

The first three Flury factors are relatively straight forward.  The fourth factor, whether there *must* be a showing of bad faith before a sanction may be imposed, is not.  Defendant has argued that bad faith must be shown before any sanction may be imposed where evidence is lost.

Flury said:  "*Dismissal* represents the most severe sanction available to a federal court, and therefore should only be exercised where there is a showing of bad faith and where lesser sanctions will not suffice."  427 F.3d at 944 (emphasis added).  Dismissal, of course, is only one of the possible sanctions mentioned by Flury.  Still, the Eleventh Circuit seems to have followed this formulation of the rule for a lesser sanction as well, the sanction of drawing of an adverse inference at trial.  The Eleventh Circuit has recently said that "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith."  Mann v. Taser Intern., Inc., 588 F.3d 1291, 1310 (11th Cir. 2009), quoting Bashir v. Amtrak, 119

F.3d 929, 931 (11th Cir. 1997) (*per curiam*).  The <u>Mann</u> case further explained,
however:  "While this circuit does not require a showing of malice in order to find bad
faith, mere negligence in losing or destroying records is not sufficient to draw an
adverse inference."  588 F.3d at 1310, again citing <u>Bashir</u>,119 F.3d at 931.

The case at bar is a diversity action, and federal law controls, but like <u>Flury</u>, it is
proper to also look to Florida law for guidance.  In Florida, it may be necessary to prove
intentional destruction of evidence to warrant the harshest sanctions, but such proof is
not needed for lesser sanctions.  Indeed, a lack of evidence that the destruction of
evidence was intentional may not even be needed for the harshest sanction:

> While the intentional destruction of evidence is usually met with the most
> severe sanction, *Metropolitan Dade County v. Bermudez*, 648 So. 2d 197
> (Fla. 1st DCA 1994), the inadvertent destruction of evidence
> generally calls for a lesser sanction, unless the opposing party demonstrates that its
> case is fatally prejudiced by its inability to examine the lost evidence.
> *Sponco Mfg., Inc. v. Alcover*, 656 So. 2d 629 (Fla. 3d DCA 1995), *rev.
> dismissed*, 679 So.2d 771 (Fla.1996).

<u>Aldrich</u>, *supra*, 737 So. 2d at 1125.

Thus, as we must do with all equitable doctrines where it is difficult to enunciate a
bright line rule, we must look at the how the court has applied spoliation law to specific
sets of facts.  In <u>Flury</u>, the owner of a truck sued the manufacturer.  The truck had
crashed into a tree and the air bag had not deployed.  At issue, among other things,
was the speed of the truck on impact and the "crash worthiness" of the vehicle.  427
F.3d at 940-941.  Defendant's counsel sent a letter to counsel for Plaintiff asking for the
location of the vehicle for inspection purposes.  *Id.*, at 941.  The vehicle had been
moved to the residence of plaintiff's parents, and counsel for plaintiff never responded to
the letter.  *Id.*

The vehicle was eventually removed from Flury's parents' residence and sold for salvage by his insurer, State Farm.  Counsel did not disclose the vehicle's location to [defendant] prior to its removal by State Farm, nor did he notify [defendant] of the planned removal.  Flury had no knowledge of the vehicle's whereabouts after State Farm removed it.

*Id.*, at 941-942.

The court held that judgment should have been entered for defendant, the

harshest of sanctions.  It is noteworthy here that the court did not discuss "bad faith."

Instead, the court said: "This case hinges upon the significance of the evidence

destroyed, and upon the extreme prejudice the defendant suffered as a result."  427

F.3d at 943.  The court reasoned that entry of judgment for the defendant was required:

No lesser sanction will suffice in this case.  The record reveals that plaintiff knew the location and condition of the subject vehicle for a considerable amount of time following the accident.  Moreover, plaintiff was fully aware that defendant wished to examine the vehicle.  Knowing this, plaintiff ignored defendant's request and allowed the vehicle to be sold for salvage without notification to defendant of its planned removal.  Even absent defendant's unambiguous request for its location, plaintiff should have known that the vehicle, which was the very subject of his lawsuit, needed to be preserved and examined as evidence central to his case.  Plaintiff's failure to preserve the vehicle resulted in extreme prejudice to the defendant, and failure to respond to defendant's letter displayed a clear dereliction of duty.

427 F.3d at 944-945 (footnote omitted). The court observed that plaintiff had ignored

defendant's request to examine the vehicle, "should have known that the vehicle, which

was the very subject of his lawsuit, needed to be preserved," and failed to do it,

resulting in "extreme prejudice" to defendant.

Although it is an unpublished case, Graff v. Baja Marine Corp., *supra*, further

illustrates that bad faith does not require a finding of malice.  The sanction imposed in

that case was not judgment in favor of a party, as in <u>Flury</u>, but exclusion of evidence.

310 Fed.Appx. at *301.  The court there said:

> The district court did not abuse its discretion when it imposed sanctions for spoliation.  There is no dispute plaintiffs destroyed evidence when litigation was reasonably foreseeable.  A team hired by plaintiffs' attorneys removed the gimbal housing from Maldonado's boat without notifying the manufacturers, and an individual acting at Rampolla's direction conducted destructive tensile tests on a portion of the gimbal housing without notifying the manufacturers. . . . .
>
> *                     *                     *
>
> The manufacturers suffered significant prejudice due to plaintiffs' conduct because the gimbal housing was the critical piece of evidence in this case, and the specimens tested by plaintiffs were smaller than the size mandated by the American Society of Testing Materials ("ASTM") standards for testing.  As appropriately stated by the District Court, "The prejudice [was] really two-fold. First, defendants were denied the same testing opportunities as plaintiffs. Second, by wasting what little material there was by testing specimens that did not satisfy ASTM's size requirements, Rampolla effectively prevented everyone-plaintiffs, defendants, and the court-from receiving more reliable test results" R-215, pp. 5-6.  *Even if the plaintiffs did not act with malice when they spoliated evidence, the plaintiffs were the more culpable party and caused the manufacturers substantial prejudice*. . . .

*Id*., at *301-302, citing <u>Flury</u>, 427 F.3d at 946 (emphasis added).  The court further said

that the problem was not cured by testing upon an "untested portion of the gimbal

housing [which] was not an optimum specimen for testing."  *Id*., at *302.

In summary, these two cases illustrate that the first three <u>Flury</u> elements (the

importance of the evidence, the degree of prejudice to the other party, and whether the

prejudice can be cured) are of critical importance, and "bad faith" depends in large part

upon the importance of the evidence to a fair trial and the extent to which the spoliation

had notice of that importance and of the need to preserve the evidence.

The same can be said about the result in <u>Bashir</u>.  In <u>Bashir</u>, the critical trial issue was whether the train that killed the decedent was traveling at an excessive speed.  119 F.3d at 930.  The speed recorder tape for the train was missing.  A motion for summary judgment was pending, and Plaintiff asked that an adverse inference be drawn that the train had exceeded the federal speed limit since Amtrak had failed to preserve the tape. *Id.*, at 931.  The court said the "mere negligence" in losing or destroying the records was not enough to justify an adverse inference.  *Id.*  The court said: "Thus, under the 'adverse inference rule,' we will not infer that the missing speed tape contained evidence unfavorable to appellees unless the circumstances surrounding the tape's absence indicate bad faith, e.g., that appellees tampered with the evidence."  *Id.*  There was no probative evidence that Amtrak "purposely lost or destroyed the relevant portion of the speed tape."  *Id.*  But the court did not stop there with that finding.  The court noted that the assistant engineer had looked at the speedometer at the time of impact and noted the speed was 70 miles per hour, which at that spot on the track was not excessive.  *Id.*, at 932.  The engineer had testified that after 20 years of experience it was his automatic reflex before striking an object to apply the brakes and simultaneously look at the speedometer, and he estimated the speed from his experience at those portions of the track.  *Id.*, at 931.  The court found that there was no evidence that the train was traveling in excess of 80 miles per hour, which would have been excessive speed.  *Id.*, at 932.  The court concluded: "In this case, where the evidence is exceedingly strong that the train was in fact traveling at 70 mph and where there is no evidence at all that Mascio [the engineer] or Cooke [the assistant engineer] had any motive or opportunity to try to tamper with the tape, we conclude that an

adverse inference is not warranted." *Id*.  In other words, the court was suggesting that the lack of this evidence was probably not that prejudicial as all of the evidence indicated that the missing tape would have confirmed that the train was not traveling at an excessive speed.

As noted above, "bad faith" does not mean malice, that is, intentional misconduct.  While evidence of intentional destruction of evidence would surely show "bad faith," it is not a condition precedent.  Indeed, proof of malicious destruction of evidence would rarely be available where one party has full control of the evidence. Instead, I believe that "bad faith" exists in a case like the case at bar, where (1) the evidence is plainly central to a potential claim that might arise and the party knows it or reasonably should know it, (2) the lack of the evidence will significantly benefit the party who fails to preserve it, (3) the evidence of what happened is unsettled and probably would be significantly clarified if the lost evidence still available, and (4) the reasons given by for not preserving the critical evidence are suspiciously irrational.

Bad faith has been shown here.  Defendant intentionally let the inside video evidence be destroyed over time, knowing that claims were coming and that counsel for Plaintiffs had asked that the surveillance evidence be preserved.[3]  Defendant let the evidence be lost because Defendant knew that it would not help, and probably would hurt, its defense.

Probable cause is a central question in this case.  Plaintiffs' claims depend upon evidence arising from events both inside the store and outside the store, and central to

---

[3] While I find that the spoliation here was intentional, it is possible to conclude that the spoliation was the result of deliberate or reckless indifference, effectively the same as an intentional act.  The result is the same.

Defendant's defense of those claims is the argument that Lott, Steele, and Aultman acted reasonably, with probable cause or at least reasonable suspicion that one of the children had stolen a camera.  Count I seeks liability for negligent supervision of employees in the encounter outside the store, but alleges that the consequence was, inter alia, false imprisonment.  Doc. 1, pp. 17-18.  Count II seeks liability for battery of Damian Britton without legal justification, but a touching to effect a lawful detention would be a defense.  *Id.*, pp. 19-20.  Count V alleges false imprisonment of Damian Britton, and encircling and entrapping Rhonda Britton and Christopher Britton, and probable cause will be a defense to that claim.  Other counts will rise or fall based upon the reasonableness of the actions of Walmart in accusing the Britton teens of theft and, if proven, detaining them.

Defendant plans to defend with evidence from the maintenance man, Mr. Steele, as to what he claims he heard and saw in the restroom, to prove probable cause or arguable probable cause.  Had the video evidence been preserved, the jury would have been able to see whether Mr. Steele in fact exited the bathroom with a digital camera box in his hand just after the Britton teens left the restroom.  The jury possibly would have been able to see whether Mr. Steele then talked with Mr. Lott at another location and handed him an empty digital camera box.  Further, even if those events were depicted on the video, the jury apparently would have been able to see that the Britton teens never touched a digital camera while in the camera portion of the store, did not do anything suspicious, and did not have any suspicious bulges in their clothing going into the restroom.  From this the jury could perhaps conclude that Steele himself or another

employee stole the camera, and Steele sought to divert attention to the Britton teens. Plaintiffs are now severely prejudiced in their litigation of the issue of probable cause.[4]

The sanction of entry of judgment in favor of Plaintiffs on all or part of the claims is arguably warranted since the spoliation of critical evidence was intentional, but I believe it would be too harsh in this case.  Defendant's witnesses candidly testified to what they saw on the videos, their testimony is not helpful to their defense, and that evidence will be available at trial.  Further, the videos of what happened outside are available, and the events that occurred outside are also important to the proof of Plaintiffs' claims.

A better sanction, and one that would more precisely cure the problem of the lack of inside surveillance evidence, is to prohibit Defendant from presenting a defense of probable cause, arguable probable cause, or any other justification or mitigation, based upon testimony from Steele, Lott, or any other person.  Defendant's witnesses have said that there was no evidence that the Britton children did anything suspicious on the inside surveillance videos, and there has been no evidence that any other person saw the Britton children do anything that would give rise to reasonable suspicion or probable cause, so the complete preclusion of this defense would not be unfair.

---

[4] It is also possible that the indoor video surveillance evidence would have helped resolve a second issue, other than probable cause, and that is whether Lott in fact physically restrained Damian Britton.  It is probable that the physical restraint occurred on the outside as the evidence I have seen so far suggests that Lott followed the Britton teens outside the store, waiting for them to cross the last marker before confronting them.  If that is the case, then the inside videos would have no bearing upon the factual question of whether Lott indeed physically restrained anyone.  I assume, therefore, that the loss of the inside video evidence has not prejudiced Plaintiffs in their claim that Lott physically restrained Damian Britton.

Two additional sanctions are also warranted.  First, Plaintiffs have been put to the expense of litigating this issue, and Defendant intentionally allowed the interior video surveillance to be lost.  Defendant should reimburse Plaintiffs their full costs, including reasonable attorney's fees, for this part of the litigation.

Second, Plaintiffs should be reimbursed one-half of their expenses for the litigation of the motion to expedite production of the video evidence in advance of the depositions, doc. 17.  Defendant had an arguable basis to resist expedited production of the outside video surveillance evidence, but had no basis to pretend that the inside video surveillance evidence existed and to resist expedited production of that evidence as if it existed.

Accordingly, it is **RECOMMENDED** that Plaintiffs' motion for sanctions for spoliation of evidence, doc. 33, be **GRANTED**, and that the court **ORDER** as a remedy that Defendant be precluded from presenting a defense of probable cause, arguable probable cause, or any other justification or mitigation, by evidence from Steven Steele, Derrick Lott, or any other person, that Defendant be ordered to pay all of Plaintiffs' expenses, including reasonable attorney's fees, for the litigation of this motion, doc. 33, and that Defendant be ordered to pay one-half of all of Plaintiff's expenses, including reasonable attorney's fees, for the litigation of the motion for expedited production of the video surveillance evidence, doc. 17.

**IN CHAMBERS** at Tallahassee, Florida, on June 8, 2010.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.